889 F.2d 701
 EUGENE D., a minor, By and Through his mother and next
friend, OLIVIA D., Plaintiff-Appellee,
v.
John R. KARMAN, Jr., Margery Taylor Chapleau, Sherry Haydon
Bruce, Mary Johnston Ballard, Marcia Miller Purol,
Pruda Bird, Ellen Receveur Wade, and
Vicky Youngman Schweickhardt,
Defendants-Appellants.
 No. 87-5346.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 26, 1988.
Decided Nov. 13, 1989.
Rehearing and Rehearing En Banc Denied Jan. 22, 1990.
 
 Ryan M. Halloran, General Counsel, W. Kimble Moore, Jr. (argued), Cabinet for Human Resources, Office of General Counsel, Frankfort, Ky., for defendants-appellants.
 Tom Hectus, Allen Button, Louisville, Ky., Theresa Demchak (argued), Abigail English, Hilda Taylor, Nat. Center for Youth Law, Mark I. Soler, Carole B. Shauffer, Youth Law Center, San Francisco, Cal., for plaintiff-appellee.
 Before MERRITT, Chief Judge; KENNEDY, Circuit Judge; and ENGEL, Senior Circuit Judge.*
 ENGEL, Senior Judge.
 
 
 1
 In this civil rights action under 42 U.S.C. Sec. 1983, defendants, who are various Kentucky social workers, appeal the district court's order denying their motion for summary judgment based on qualified immunity. Plaintiff, Eugene D., is a minor who claims that he came to harm while placed in a state-licensed foster home as a result of the social workers' deliberate indifference to his serious medical and developmental needs. The defendants contend that during a period from May, 1974 until December, 1982, when Eugene was in the foster home, it was not clearly established that the Due Process Clause of the Fourteenth Amendment imposed upon them a duty to assume responsibility for his care. Because the district court improperly found that such a constitutionally imposed obligation was clearly established, we now reverse.
 
 I.
 
 2
 Eugene D. was born on August 30, 1973. Some six months later, on February 6, 1974, his mother, Olivia D., took him in a comatose state to the Louisville General Hospital. The next day, Eugene was transferred to Kosair's Children's Hospital, where he remained until March 14, 1974, when he was discharged and sent to the Jewish Convalescent Home. It was later determined that sometime before his mother took him to the hospital, Eugene had sustained brain damage, apparently as the result of some form of trauma, which rendered him severely mentally retarded with spastic cerebral palsy. Eugene remains essentially blind, nonverbal and non-ambulatory. He is totally dependent on others for care, including his feeding and personal hygiene. Moreover, the damage to Eugene's brain causes him difficulty in swallowing and, as a result, simply feeding Eugene requires several hours a day. He also needs to be turned every four hours to prevent bedsores and to be given physical therapy on a daily basis.
 
 
 3
 The exact cause of the brain damage has not been established. The Jefferson County Metropolitan Social Services Division filed a petition alleging suspected abuse with the Juvenile Division of the Jefferson County Court, but Eugene was not found to have been abused by his mother. Instead, the court found him to be a "dependent child" pursuant to Ky.Rev.Stat. Sec. 208.020, and committed him to the legal care, custody and control of a predecessor agency to the Kentucky Cabinet for Human Resources (KCHR).[1] Likewise, Eugene's underlying condition, which is indeed pitiable, is one which cannot be fairly charged to any of the defendants in this case.
 
 
 4
 Upon his release from the Jewish Convalescent Home on May 1, 1974, Eugene was placed by KCHR in the state-licensed foster home of Mrs. Blanche Smith, which is located in Jefferson County, Kentucky. Mrs. Smith, a sixty year old widow at the time, was also responsible for the care of her six year old grandson and a second handicapped foster child. Subsequent to Eugene's placement in the home, two additional severely handicapped children were placed by KCHR with Mrs. Smith. Like Eugene, all of the other three children placed in Mrs. Smith's home required significant care or attention. Eugene remained in Mrs. Smith's care for some eight and one half years, until December 6, 1982.
 
 
 5
 At different times during this eight-and-one-half-year period, six of the named defendants, all KCHR employees, were assigned as Eugene's caseworkers.[2] The remaining named defendants served in supervisory positions in the KCHR during the relevant period.[3] Kentucky statutes and regulations defined defendants' responsibilities with respect to children placed in foster homes.[4]
 
 
 6
 The allegations at issue in this case concern the care and treatment Eugene received while in Mrs. Smith's foster home, which Eugene contends impaired his physical and developmental growth, shortened his life expectancy and caused him great pain and discomfort. Eugene has produced evidence which, viewed in the light most favorably to him, indicates that because of her inadequate training, her unwillingness or inability to follow directions regarding Eugene's care, and the demands for the care of the other children placed in her home, Mrs. Smith was initially and became increasingly unable to care for Eugene. As a result, Eugene received a diet that was nutritionally inadequate, causing him to suffer from malnutrition, to lose weight and to fail to gain as much weight as might be expected of a child in his condition. It is also evident that he did not always receive the physical therapy he required. Although Eugene ordinarily attended school and kept numerous medical appointments, the proofs showed that during certain periods Mrs. Smith allowed him to miss school and failed to keep a number of medical appointments.
 
 
 7
 As early as 1976, KCHR social workers began to express concern regarding Mrs. Smith's ability to care for Eugene. Medical, educational and other personnel who provided treatment and services to Eugene shared those concerns. More important, at various times during the relevant period, they reported their concerns regarding Eugene's weight, hygiene, school attendance, and missed medical appointments to KCHR workers. Despite these reports over a six-year period, Eugene was not removed from Mrs. Smith's care until December, 1982.
 
 
 8
 In addition to this evidence of inaction or insufficient action despite mounting evidence that Eugene was at least receiving inadequate care, Eugene has introduced evidence regarding a number of particular incidents which he believes were ignored or improperly handled by the defendants. Perhaps the most significant of these involves Eugene's allegation that his caseworker failed to investigate the circumstances surrounding a broken leg which Eugene suffered in August, 1976. At the time, Mrs. Smith told the treating physician that the leg had been swollen for two days, presumably because of improper physical therapy administered by a baby-sitter. A radiologist who took an x-ray of the leg determined, however, that the break was at least ten days old. The hospital apparently informed Eugene's caseworker of the injury, but no investigation was undertaken by the KCHR.
 
 
 9
 On December 6, 1982, Eugene was removed from the care of Mrs. Smith and placed in another foster home. Eugene, who was nine years old at that time, weighed only 17 pounds, four ounces and was suffering from severe malnutrition. One defendant explained that the transfer was made because of concerns regarding Mrs. Smith's failing health and her delay in following through on suggestions for improving Eugene's care made by KCHR. Eugene remained in the second foster home until January 13, 1984. He was then returned to the custody of his mother, Olivia D., for the first time since February 6, 1974. Olivia D. stated at her deposition, however, that she had visited Eugene a few times while he was in the care of Mrs. Smith.
 
 
 10
 Eugene D., by and through his mother and next friend, Olivia D., brought this action under 42 U.S.C. Sec. 1983 in the United States District Court for the Western District of Kentucky against various named and unnamed employees of KCHR. Mrs. Smith, the foster mother, was not named as a defendant. The complaint, as later amended, alleged that the defendants had deprived Eugene of his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing properly to monitor and supervise his foster care placement. More specifically, the complaint alleged that the defendants acted with "deliberate indifference" to the serious medical needs of Eugene, by failing to protect him from bodily harm at the hands of Mrs. Smith of which they knew or reasonably should have known. The complaint further alleged that as a direct and proximate result of defendants' acts and omissions, Eugene suffered permanent physical, developmental, psychological and emotional damage. The relief sought in the complaint was compensatory and punitive damages from each individual defendant sued solely in his or her personal capacity.[5]
 
 
 11
 After extensive discovery, the district court considered defendants' motions for summary judgment, which were based in part upon claims of qualified immunity. The court denied the motions, holding that during the period from May, 1974 until December, 1982, it was clearly established "that there was a constitutional right of a person in custody to be free from harm resulting from deliberate indifference." Memorandum Opinion of February 25, 1987 at 5. The district court further found that the evidence introduced by Eugene created genuine issues of material fact regarding such a claim. In particular, the court noted a dispute as to whether defendants' conduct amounted to "deliberate indifference" or whether there was merely a difference in professional judgment between the experts for each side regarding what type of care should have been provided.
 
 
 12
 In reaching its conclusion regarding the immunity issue, the district court primarily relied on cases arising in an Eighth Amendment setting. See Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (holding that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eighth Amendment."). Accord Williams v. Vincent, 508 F.2d 541, 544 (2d Cir.1974) (a complaint based on inadequate medical treatment states a cause of action if it alleges conduct which "shocks the conscience," such as deliberate indifference by prison authorities to a prisoner's request for essential medical treatment); Martinez v. Mancusi, 443 F.2d 921, 923 (2d Cir.1970) (a complaint claiming violation of Eighth Amendment by virtue of failure to provide medical care "must suggest the possibility of some conduct that 'shocks the conscience.' "). The district court reasoned that such cases provide support for Eugene's claim because an individual in custody who has been convicted of no offense is entitled to treatment at least as favorable as that to which convicts are entitled. Memorandum Opinion at 6 (citing Jones v. Wittenberg, 323 F.Supp. 93 (N.D.Ohio 1971)).
 
 
 13
 In addition, the district court relied upon two cases which at least in part involved something other than a violation of a plaintiff's right to be free from cruel and unusual punishment. The district court relied on our court's opinion in Fitzke v. Shappell, 468 F.2d 1072 (6th Cir.1972), which held that the concept of due process mandates that a pretrial detainee be given necessary medical treatment where circumstances are such that it is clear that such treatment is necessary. The district court also cited Harper v. Cserr, 544 F.2d 1121 (1st Cir.1976), in which the Court of Appeals for the First Circuit held that a voluntarily committed mental patient could be so helpless as to be considered a de facto prisoner, thus entitling her to bring a section 1983 claim alleging violations of the Eighth Amendment or possibly even the Due Process Clause of the Fourteenth Amendment when those caring for her act with "wanton callousness." 544 F.2d at 1124. The First Circuit went on to hold, however, that such a right could not reasonably have been foreseen by the defendant, and that plaintiff would therefore not be allowed to recover damages absent a "showing of wanton neglect tantamount to actual malice." 544 F.2d at 1125.
 
 
 14
 Consistent with its conclusion that the cases arising in these different settings served to establish the constitutional right alleged by Eugene, the district court rejected defendants' contention that, at the very earliest, the right alleged by Eugene was clearly established by Doe v. New York City Dep't of Social Services, 649 F.2d 134 (2d Cir.1981), which was decided on May 13, 1981. As will be discussed more fully below, the plaintiff in that section 1983 action claimed that the New York City Department of Social Services ignored clear evidence that she was being sexually abused by her foster father. Drawing an analogy to Estelle v. Gamble, supra, the Second Circuit held that the plaintiff could maintain her action if agency officials were deliberately indifferent to a known injury or risk to the foster child. 649 F.2d at 145.
 
 
 15
 Defendants filed this interlocutory appeal on the immunity issue. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); Kennedy v. City of Cleveland, 797 F.2d 297 (6th Cir.1986). We now reverse.
 
 II.
 
 16
 The Supreme Court has made clear that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness of the action' ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citing Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). This standard reflects a careful balance between two conflicting concerns:
 
 
 17
 In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees.... At the same time, however, it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty--at a cost not only to the defendant officials, but to society as a whole. These social costs include expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties."
 
 
 18
 Harlow, 457 U.S. at 814, 102 S.Ct. at 2736 (citations and footnote omitted); Cf. Anderson, 107 S.Ct. at 3038.
 
 
 19
 In Anderson v. Creighton, supra, the Supreme Court elaborated on the level of generality at which legal rights are "clearly established." The Court made clear that for a right to be clearly established it must have been articulated with a significant degree of particularity:
 
 
 20
 The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.
 
 
 21
 107 S.Ct. at 3038-39. This particularity requirement does not mean that the very action in question must have been held unlawful; it does mean, however, that in light of the pre-existing law, the illegality of the action must be apparent. Id. at 3039.
 
 
 22
 The issue of qualified immunity is a question of law for the district court; thus, on appeal we consider the issue de novo. In deciding whether the law was clearly established, we look to "federal constitutional, statutory or case law existing at the time." Dominque v. Telb, 831 F.2d 673, 677 (6th Cir.1987). When the focus is on decisional law, we examine initially, and most importantly, the decisions of the Supreme Court and the courts of this circuit. Poe v. Haydon, 853 F.2d 418, 424 (6th Cir.1988).[6] If case law from these sources is unavailable, we may also look for guidance to the cases from other circuits. Id. We recognize, however, that a single recent case from the court of appeals of another circuit is hardly sufficient to make the law "clearly established" in this circuit. See Hensley v. Wilson, 850 F.2d 269, 275 (6th Cir.1988); Davis v. Holly, 835 F.2d at 1182.
 
 III.
 
 23
 The starting point of our analysis is a review of Eugene's claims against the defendants. Because his complaint is drafted in broad and sweeping terms, it is difficult to ascertain exactly what acts were allegedly committed by which defendant. Suffice it to say, however, that Eugene alleges that KCHR personnel ignored clear evidence that (1) his weight was dangerously low; (2) his hygiene level was unacceptable; (3) he was receiving inadequate or inappropriate physical therapy; (4) he regularly missed medical appointments; (5) his school attendance was poor; and (6) he did not receive adequate medical equipment for the treatment of his medical conditions. Eugene also alleges that Eugene's placement in Mrs. Smith's foster home was made without adequate screening or training of the foster mother and without adequate training of the social workers assigned to his case. Based upon these allegations, Eugene asserts that defendants were deliberately indifferent to his needs and, as a result, deprived him of "his right to be free from bodily harm and unjustified intrusions upon his personal security and safety as guaranteed by the due process clause of the Fourteenth Amendment."[7] Amended Complaint at 18.
 
 
 24
 In its Memorandum Opinion, the district court held that throughout the relevant time period there was a clearly established "constitutional right of a person in [state] custody to be free from harm resulting from deliberate indifference" on the part of that person's custodians. We find, however, that the "right" the district court found to have been clearly established was not the particularized right required by Anderson v. Creighton, supra, and, therefore, was not sufficient basis for a denial of the defendants' motion for summary judgment. The "right" that is truly at issue here, stated in its most general form, is the right of a foster child to be protected from bodily harm at the hands of a state-licensed foster parent.
 
 
 25
 We agree with the parties that the constitutional source of any such affirmative obligation to protect Eugene is the substantive as contrasted to the procedural component of the Due Process Clause of the Fourteenth Amendment.[8] Because the Due Process Clause simply provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law," Eugene looks to decisional law in arguing that the particular right alleged to have been violated was clearly established throughout the relevant period.
 
 
 26
 Eugene does not claim that such an affirmative obligation to protect foster children was clearly established throughout the period from May, 1974 until December, 1982 by virtue of the express holding of any specific opinion of the Supreme Court or of our circuit; such a claim would certainly fail. In an opinion issued on February 22, 1989, DeShaney v. Winnebago County Dep't of Social Services, 109 S.Ct. at 1006 n. 9, the Supreme Court made clear that it has not yet addressed whether the placement by the State of a child in a foster home operated by its agents, gives rise to an affirmative duty to protect that child. Likewise, our court has not yet addressed the issue, nor need we do so today for the complaint seeks only monetary damages from the defendants.
 
 
 27
 Eugene does assert, however, that the courts of other circuits held during the period in question that children have a constitutionally protected right to be free from harm while in state foster care. He argues, in part, that these cases support the district court's conclusion that such a right was clearly established during the period at issue. The earliest such case cited by Eugene is Brooks v. Richardson, 478 F.Supp. 793 (S.D.N.Y.1979). In that case, plaintiff's children were placed in the custody of the Commissioner of Social Services and Brookline Home for Children (BHC), a nonprofit corporation which was under contract from the Commissioner to place children in certified foster homes. Denying defendant BHC's motion to dismiss the complaint, the district court held that plaintiff's allegations that the children had been abused and neglected while under the control of BHC were sufficient to state a federal cause of action. The district court stated the governing principle of law as follows: "A child who is in the custody of the State and placed in foster care has a constitutional right to at least humane custodial care." Id. at 795.
 
 
 28
 Eugene also cites Doe v. New York City Dep't of Social Services, supra, where the Second Circuit reversed a jury verdict that the agency responsible for placing the plaintiff in a foster home and supervising her care was not liable for the plaintiff's injuries where evidence showed that the agency had failed to act on its knowledge that plaintiff's foster father was abusing her. In reaching its decision, the court explained: "When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution." Id. at 141. The court further explained that section 1983 liability could be imposed on such defendants "if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution." Id. at 145.
 
 
 29
 Of course, Doe v. New York City Dep't of Social Services, which was decided on May 13, 1981, near the end of the period in question, would only put defendants on notice, under an objective standard, of such constitutionally imposed obligations from that time forward. As noted above, however, our court will not be easily swayed by the decisions of circuit and district courts other than our own when determining whether a constitutional right has been clearly established in this circuit. See, e.g., Hensley v. Wilson, 850 F.2d at 275; Davis v. Holly, 835 F.2d at 1182. Here, only a single circuit court and a single district court, both outside of our jurisdiction, had recognized the right in question during the time period that Eugene's rights were allegedly violated. Harlow's "objective legal reasonableness" test does not require state officials to know and to follow the most advanced state of the law as established by a remote court of the land. Accordingly, we are convinced that these cases alone do not, as a matter of law, clearly establish in our circuit, during the relevant time period, the constitutionally imposed affirmative obligations Eugene claims are at issue in this case.[9]
 
 
 30
 In addition to arguing that decisions such as Doe and Brooks, which arose in the foster care setting, clearly established the right in question, Eugene claims that decisions involving incarceration and involuntary institutionalization also served to make apparent the unlawfulness of defendants' conduct throughout the relevant time period. Indeed, Eugene asserts that it was clearly established throughout the relevant period that the State has an obligation to provide "all those involuntarily placed in a custodial environment with safe living conditions and protection from harm." In making this argument, Eugene contends that this case involves the deprivation of his "historic" liberty interest in "free[dom] from ... unjustified intrusions on personal security." Ingraham v. Wright, 430 U.S. 651, 672-73, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977) (citing Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)). He further claims that it was clearly established throughout the relevant period that this liberty interest is not extinguished by lawful confinement in state custody. Thus he concludes the State owes all those in custody some duty of care and protection. In making this argument, Eugene presumably relies on the language in Anderson v. Creighton which indicates that "the very action in question" need not have been held unlawful for the law to be clearly established. 107 S.Ct. at 3039. As described above, the district court essentially adopted this analysis in its Memorandum Opinion.
 
 
 31
 In explaining the decisional basis for this "clearly established" affirmative obligation which is constitutionally imposed on state custodians, Eugene points to Eighth Amendment decisions which impose upon the State affirmative duties of care and protection with respect to certain individuals. In particular, he relies on Estelle v. Gamble, supra, where the Supreme Court recognized that the Eighth Amendment, as applied to the States through the Due Process Clause, imposes liability on prison officials when they are deliberately indifferent to the medical needs of prisoners. In that case the Court reasoned that "it is [only] just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." Estelle, 429 U.S. at 104, 97 S.Ct. at 291 (quoting Spicer v. Williamson, 191 N.C. 487, 490, 132 S.E. 291 (1926)). Eugene also points out that a number of circuits, including our own, had recognized in opinions decided before or during the relevant period that inmates could not be deprived of necessary medical care and treatment. See, e.g., Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir.1976); Martinez v. Mancusi, supra.
 
 
 32
 Eugene also relies on decisions in which some courts, including our own, have recognized that the substantive component of the Due Process Clause, independent of the prohibitions of the Eighth Amendment, imposes upon the State similar affirmative duties of care and protection of pretrial detainees. See, e.g., Fitzke v. Shappell, supra.
 
 
 33
 Finally, Eugene points to decisions holding that the substantive component of the Due Process Clause imposes certain obligations upon the State when it places individuals in nonpenal institutions. See, e.g., Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); New York State Ass'n for Retarded Children, Inc. v. Rockefeller, 357 F.Supp. 752 (E.D.N.Y.1973). In Youngberg, the Supreme Court held that the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their "reasonable safety" from themselves and others. The Court explained "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed--who may not be punished at all--in unsafe conditions." 457 U.S. at 315-16, 102 S.Ct. at 2457-58.
 
 
 34
 As the Supreme Court's recent decision, DeShaney v. Winnebago County Dep't of Social Services, supra, makes clear, the cases relied upon by Eugene can be read to support his assertion that the Due Process Clause of the Fourteenth Amendment imposes affirmative duties on the State whenever it takes an individual into its custody. In that case, the guardian ad litem of a child who had been beaten by his father brought a section 1983 action against social workers who had received complaints that the child was being abused by his father but had not removed him from his father's custody. The Court held that defendants' failure to provide the child with adequate protection against his father's violence did not violate the child's rights under the substantive component of the Due Process Clause because the State has no affirmative obligation to protect individuals who are not in state custody. 109 S.Ct. at 1006.
 
 
 35
 In reaching its decision, the Court noted that Estelle and Youngberg, "taken together," stand for "the proposition that when the State takes a person into its custody and holds him there against his will the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney, 109 S.Ct. at 1005 (citing Youngberg, 457 U.S. at 317, 102 S.Ct. at 2458-59). The Court explained "[t]he rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care, and reasonable safety--it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." 109 S.Ct. at 1005-06.
 
 
 36
 Of course, the Supreme Court's explicit statement in DeShaney cannot be relied upon by Eugene to establish such obligations during a period ending some six years earlier. Moreover, we cannot allow hindsight to control our analysis; the gloss that DeShaney put on the cases cited by Eugene was not available to the defendants in this case during the relevant period. Instead, we must determine whether the cases cited by Eugene, decided before or during the relevant period, clearly established the legal rules upon which he bases his claim.
 
 
 37
 We find that those cases did not clearly establish the Fourteenth Amendment violations alleged in this case. Assuming, but expressly not deciding, that nonpenal involuntary institutionalization is most similar to the situation involved in this case, and thus most likely to advise social workers of such constitutionally imposed obligations, we begin our analysis of this inquiry there. The leading case in that area is Youngberg v. Romeo, supra, which leaves no doubt that the substantive component of the Fourteenth Amendment's Due Process Clause imposes certain obligations upon the State with respect to involuntarily committed mental patients. We are persuaded, however, that in light of Youngberg and the similar cases cited by Eugene, "[t]he contours of the right" alleged by Eugene were not "sufficiently clear that a reasonable official would understand that what he [wa]s doing violate[d] that right." Anderson v. Creighton, 107 S.Ct. at 3039. As noted above, the rationale underlying the affirmative duties imposed in Youngberg and Estelle is that by taking an individual into custody, the State renders him unable to care for himself. This helplessness arises because the State has removed and isolated the individual from the community and placed him under direct control of the institutional authorities.
 
 
 38
 By contrast, a child placed in foster care is at least arguably not in custody in the sense of Youngberg. Foster care is designed to provide an environment as close to the home environment as possible under the circumstances: the foster child lives in the community, attends school, and is seen by doctors. Moreover, and as a direct result of this situation, the control the State may exercise over the child and thus the protection it may provide him with is diminished. As the Second Circuit explained in Doe v. New York City Dep't of Social Services:
 
 
 39
 There is a closer and firmer line of authority running from superiors and subordinates within an institution than exists in the foster care context, particularly in respect of the relationship between agency personnel and the foster parent. Institutional administrators can readily call in subordinates for consultation. They can give strict orders with reasonable assurance that their mandates will be followed, and as added insurance other employees stationed in proximity of subordinates to whom orders are directed may be instructed to monitor compliance.
 
 
 40
 By contrast [the agency responsible for supervising the foster child] had to rely upon occasional visits for its information gathering, and its relationship to the foster family was less unequivocally hierarchical than is the case with prison guards and a warden
 
 
 41
 * * *
 
 
 42
 ... the agency felt constrained to respect the foster family's autonomy and integrity and pressured to minimize intrusiveness, given its goal of approximating a normal family environment for foster children.
 
 
 43
 649 F.2d at 142. Of course, in Doe the Second Circuit held that the "deliberate indifference" standard set out in Estelle applied in the foster care as well as the institutional setting, and reasoned that because of these differences courts should be less willing to infer the requisite state of mind for a constitutional violation on the part of a state custodian in the former setting than in the latter. Id. Yet, these differences also raise serious questions as to whether foster care placement is sufficiently analogous to institutionalization so that a reasonable official would understand that, as a matter of law, the Fourteenth Amendment's Due Process Clause imposed similar affirmative obligations upon him or her. Cf. DeShaney, 109 S.Ct. at 1006 n. 9.
 
 
 44
 At some later date our circuit or the Supreme Court may definitively decide whether the placement of a child in a state-licensed foster home which is supervised by state agents is sufficiently analogous to institutionalization to give rise to a constitutionally imposed affirmative duty to protect. However, we are convinced that the differences are sufficient to require us to hold, under an objective legal reasonableness standard, that it was not clearly established at any time during the relevant period that such an obligation existed by virtue of the Constitution.[10] It would therefore be improper to impose personal liability on these defendants on that basis.
 
 
 45
 For similar reasons we believe that the cases addressing a State's obligations in the Eighth Amendment setting do not clearly establish that defendants owed Eugene constitutionally imposed duties. We reach this conclusion even though some courts, relying upon Estelle and other cases arising in the Eighth Amendment setting, have determined that the Fourteenth Amendment's Due Process Clause imposes analogous affirmative obligations on the State when it places an individual in foster care. See, e.g., Doe v. New York City Dep't of Social Services, supra. Those cases involved the substantive issue of whether such a constitutional duty existed at all. The instant case, by contrast, involves the distinct question of whether such a principle of law was clearly established. We may not impose personal liability upon state social workers because they failed to anticipate that principles of law developed in other distinct contexts would be applied to them, for to do so would be contrary to the admonition in Anderson v. Creighton, 107 S.Ct. at 3039, that we should not allow plaintiffs to convert "the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."
 
 
 46
 We therefore conclude that the district court erred in holding that qualified immunity did not apply to the defendants in this case. While the cases cited by the court below and by Eugene on appeal viewed together evidence significant developments in the law in this area during the relevant time period, see, e.g., Youngberg, 457 U.S. at 314, 102 S.Ct. at 2457, they are in our view, whether taken individually or together, insufficient to place defendants on notice that their conduct violated clearly established law. Therefore, we believe that subjecting these defendants to personal liability for the tragic circumstances of this case would simply upset the balance that the Supreme Court has directed us to strike between the interests in vindication of citizens' constitutional rights and public officials effective performance of their duties. Accordingly, we REVERSE and REMAND with directions to grant defendants' motions for summary judgment on the basis of qualified immunity.
 
 
 47
 MERRITT, Chief Judge, dissenting.
 
 
 48
 This case is about the protection the due process clause offers to children who are wards of the state, a case in which the majority has held that officials have no personal liability for allowing such wards to be physically abused by foster parents. The Court holds that the law which has developed under the due process clause concerning wards of the state is so unclear and unformed that officials should not reasonably understand that they have a legal duty to put a stop to known and ongoing physical abuse. The Court refuses to say under due process that state officials have even the most minimal legal duties to protect such wards from physical harm. I disagree with the Court's understanding of the law, its history and development, and its application to this case.
 
 
 49
 The majority denies Eugene D. access to federal court on the basis of two readily apparent errors. First, it provides an inadequate statement of the right asserted here. Eugene D. does not assert merely "the right of a foster child to be protected from bodily harm at the hands of a state-licensed foster parent." Op. at 708. The state's role here is not limited to licensure of the foster home. In addition, the state took Eugene D. out of his mother's custody, apparently in the context of an abuse proceeding, assumed custody itself, and then bestowed custody on a foster parent of its sole selection. No one--not Eugene, not his mother, not another relative or a public-minded citizen--could transfer Eugene from his placement; that could be done only by the state. The right asserted here is the right not to be legally constrained to remain in the custody of a foster parent who, as state officials knew, continually and repeatedly provided dangerously inadequate care.
 
 
 50
 A violation of this right is proven adequately for this preliminary stage of the proceedings in this case. According to the record, the defendants, state social workers, placed the plaintiff child with a foster parent. The foster parent failed to provide decent food, clothing, medical attention and education. At age 9 the child weighed only 17 pounds and had a broken leg which had gone uncared for. The child was not bathed and was kept in filthy conditions and clothing. The defendants had knowledge of the conditions in which the child was made to exist, and they did nothing to correct the situation for many years.
 
 
 51
 Second, the majority errs when it determines that the defendants have qualified immunity from a Sec. 1983 action asserting a right not to be committed to the care of a foster parent who, as the defendants knew, exposed the plaintiff to continual and severe danger and suffering. Here, the majority overstates the novelty of the question before it, and gives a rigid and wooden reading to the Supreme Court precedents on qualified immunity.
 
 
 52
 The last half of the Twentieth Century is hardly the first time this type of question before us today has arisen in our legal system. The rights of helpless children who are wards of the state has a history going back to the Magna Carta and beyond. The feudal "law of the land" of the Twelfth Century gave children upon the death of their parents a cause of action for abuse by a liege lord, the feudal equivalent of a state official who held office under the authority of the King. The feudal law created a series of causes of action, beginning with the writ of mort d'ancestor in 1176, which the child had against a lord or other persons for the theft of inheritance and other forms of abuse. See I Pollock & Maitland, History of English Law, Bk. II, Chap. I, Sec. 8, at 318-29 (Lawyers Literary Club ed. (1959)); and W.L. Warren, Henry II 342-48 (1977). In addition, four sections of the Magna Carta of 1215 chapters 3, 4, 5, and 37 treated the grievances of the Barons against King John for his abuse of the rights of children in connection with wardship. See McKechnie, Magna Carta 203-12, 367-69 (2d ed. 1914); Ganshoff, Feudalism 127-28 (English ed. 1952). Thus, the law of England in 1215 protected wards against abuse by the state, both through the newly developing common law writs and by the constitutional law promulgated in the Magna Carta.
 
 
 53
 Should the "due process of law" of the Twentieth Century for the protection of helpless children from official abuse be less attentive in its protection than the "law of the land" in the time of Glanville, Henry II and the Magna Carta? If the law against such official child abuse was sufficiently clear then to have been declared as the law of the realm at Runnymede, "the contours of the right must be sufficiently clear [to] a reasonable official" today to provide minimal protection, Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). One need not be a scholar of the Magna Carta or the law in the time of Henry II to see the irony in saying that the law of the land against official child abuse was settled in the formative years of our legal system eight centuries ago, but as the system has advanced, the protection of children in wardship to the state has regressed. The law is surely capable of more continuity and more humanity than that.
 
 
 54
 Our court has held that the defendant officials are immune in this suit, freeing them of any legal responsibility whatsoever for the welfare of the child they took into custody and placed in the foster home. The major premise of the Court's opinion by which this result is reached is certainly correct as far as it goes: neither the Supreme Court nor our Court has yet specifically ruled that foster children generally, or foster children held in custody under Kentucky's particular foster care system, are protected by the due process clause. There is no case in the Supreme Court or in our Court on foster care which specifically establishes "deliberate indifference" or "reckless disregard" or "gross negligence" or any other particular set of words as the standard of a ward's substantive due process rights.
 
 
 55
 But the reason that neither of the two Courts has yet reached such a decision is simple: we have not had a case that presented the issue of care in the specific context of foster care. Thus, there are no cases which specifically say that foster children are not protected under substantive due process. The cases from the two Courts have not expressly decided the issue either way.
 
 
 56
 Counsel for plaintiff at page 27 of her brief points out concisely the fundamental error in the position of the defendants which our Court has now adopted:
 
 
 57
 In essence, defendants [and the court] argue that unless the factual situations in the two cases are identical, the holding of one case can never be applied to the other. Of course, no such requirement exists. Instead courts look to the principles underlying a holding to determine its relevance to subsequent cases.
 
 
 58
 Our Court has erred by asking the wrong question and therefore made the case turn on the wrong major premise. Instead of asking a narrow question--is there a specific or identical case on foster care?--the Court should have asked: is there a principle of substantive due process well established in our legal conscience that covers a person held in state custody, including a foster care child? The answer to that question is yes.
 
 
 59
 In DeShaney v. Winnebago County Dep't of Social Services, --- U.S. ----, 109 S.Ct. 998, 1005-06, 103 L.Ed.2d 249 (1989), the Supreme Court in dicta said in a foster care case that it had previously found in our legal conscience and declared a principle of reciprocity which covers the subject:
 
 
 60
 When the state takes a person into its custody and holds him there against his will the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.
 
 
 61
 The Court explained the moral basis of this principle:
 
 
 62
 The rationale for this principle is simple enough: when the state by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs--e.g., food, clothing, shelter, medical care and reasonable safety--it transgresses the substantive limits on state action set by the eighth amendment and the due process clause.
 
 
 63
 The plaintiff argues that this fundamental master principle is applicable to wards of the state placed with foster parents, and I agree.
 
 
 64
 There are many cases respecting mental patients, pretrial detainees, prisoners, and juvenile delinquents which establish the principle that state officials may not remain completely indifferent to the health and safety of persons detained in state custody. The principle applies not only to prisoners under the Eighth Amendment, Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and arrestees under due process, Fitzke v. Shappell, 468 F.2d 1072 (6th Cir.1972), but also to mental patients, Youngberg v. Romeo, 457 U.S. 307, 315-16, 102 S.Ct. 2452, 2457-58, 73 L.Ed.2d 28 (1982) ("if it is cruel and unusual to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed--who may not be punished at all--in unsafe conditions"). As the majority acknowledges, the Second Circuit has applied the same principle to foster care. Doe v. New York City Dep't of Social Services, 649 F.2d 134 (1981). Neither the majority nor I find any appellate case, other than the instant case, which rejects the principle in the context of foster care.
 
 
 65
 Furthermore, no court before today has been convinced that, simply because the state chooses to place a helpless child in a foster home rather than in a state-operated institution, and persists in holding him to that custody despite ongoing harm, the concept of fundamental decency and reasonable care expressed in Youngberg has no application. Indeed, the Supreme Court suggested in Youngberg that mental patients are not confined for punishment's sake and therefore "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Youngberg, 457 U.S. at 322, 102 S.Ct. at 2461 (emphasis added). An irony of our Court's decision in the instant case is that, because the plaintiff is a helpless child placed in foster care through no fault of his own, rather than an adult felon, he is not entitled even to minimal due process protection. Such a result is not only inhumane but inconsistent with the rationale of the applicable precedents.
 
 
 66
 In order to meet the test of "law" for purposes of qualified immunity "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 107 S.Ct. at 3039. The Supreme Court could have defined "clearly established" in the immunity context as the majority in this case has defined it, to mean "so clearly declared in existing case law that no court, advocate or legal scholar could question its existence." But the Supreme Court did not so define "clearly established." Instead, the Supreme Court's test asks us whether the right asserted is so clear that reasonable officials--in this as in most cases, non-lawyer officials--would understand their actions to violate that right. We are to look to the legal conscience of state officials, not to the cold pages of Shepard's or the Harvard Law Review.
 
 
 67
 With our case thus placed in the proper context, it is quite surprising to hear that officials have no duty to take reasonable steps to put a stop to continuous and unnecessary suffering caused by their actions or no obligation to give reasonable aid to those they have taken into their care, or both. Here the right arises from both the duty not to cause unnecessary suffering to a helpless child and the obligation to give aid to children under official control. The history of wardship and the recent precedents discussed above, as well as clear moral principles, make the "contours of the right" clear enough to put reasonable officials on notice.
 
 
 68
 The Court leads itself into today's erroneous ruling by taking an inflexible positivist position. It takes the view that law consists of the specific commands of the sovereign and nothing more[1] and that, since neither the Supreme Court nor the Sixth Circuit has ruled on a foster care case, there is no law on the subject. The Court fails to take into account that our law is also found in social contract, in principles of morality generally accepted by our people. The principle that children who are wards of the state deserve special protection describes an objective moral and legal reality. Had the inflexible positivist position stated in the majority opinion governed at the Nuremberg trials, those responsible for the atrocities in the gas chambers would have had no legal liability for their conduct. The Court would have said that, in the absence of a statute or case precedent directly on point, the law was too unclear to impose liability.
 
 
 69
 I do not find in Anderson v. Creighton or in previous official immunity cases an inflexible positivist legal ethic which excludes consideration of history or the legal and moral principles developed over time in analogous cases. I see no reason to blind ourselves to the moral reality that condemns the conduct alleged here, or to feel compelled to distinguish numerous analogous precedents which would, to the legal conscience of a reasonable official, be directly relevant. We should not make our decision turn purely on the question of whether there is an identical case previously decided by the Supreme Court or our Court. Accordingly, I respectfully dissent.
 
 
 
 *
 The Honorable Albert J. Engel assumed senior status on October 1, 1989
 
 
 [1]
 Eugene's exact status under Kentucky law is not clear from the record before us. It appears that custody over Eugene was "temporarily" placed with the KCHR throughout the relevant period. See Ky.Rev.Stat. Sec. 208.020 (1964). There is no indication in the record that Olivia D.'s parental rights were formally terminated at that time. See Ky.Rev.Stat. Sec. 199.600 (1972)
 
 
 [2]
 The named defendants who were Eugene's caseworkers are: defendant Mary Johnston Ballard from June, 1975 until October, 1976; defendant Vicky Youngman Schweickhardt from November, 1976 until October, 1977; defendant Marcia Miller Purol from October, 1977 until January, 1981; Sue Chmilewski from February, 1981 until September 30, 1982; defendant Ellen Wade from September 30, 1982 until October 18, 1982; and defendant Pruda Bird from October 18, 1982 until December 6, 1982. Pursuant to a settlement agreement that was approved by the district court on October 14, 1986, all claims against Sue Chmilewski have been dismissed; accordingly, she is not a party to this appeal
 
 
 [3]
 Defendant Sherry Haydon Bruce supervised a number of caseworkers, including Mary Ballard while the latter handled Eugene's case. Defendant Ellen Wade served as the supervisor to each of Eugene's caseworkers from 1978 until his removal from the Smith home in December, 1982. Defendant Margery Chapleau was a social service supervisor in Jefferson County from March, 1982 until Eugene was removed from the Smith home. Chapleau was responsible for the supervision of a number of case workers, including those handling Eugene's case. Beginning in March, 1980, defendant John R. Karman was the Family Service District Manager with KCHR for the Jefferson County district
 
 
 [4]
 While the relevant statutes were amended several times during the period in question, it is clear that at all relevant times the KCHR was required at a minimum to "locate and plan for all [dependent] children" and to perform such "other services as may be deemed necessary for the welfare of children." Ky.Rev.Stat.Ann. Sec. 199.460 (Baldwin 1988). In 1978, the statute was amended to require a medical examination of a child upon placement in a foster home, and mandatory annual examinations thereafter. Ky.Rev.Stat.Ann. Sec. 199.463 (Baldwin 1988). The 1978 amendments also required the KCHR to promulgate regulations specifying the "method used to periodically review children placed in foster homes." Ky.Rev.Stat.Ann. Sec. 199.465 (Baldwin 1988). See also Ky.Rev.Stat.Ann. Sec. 208.010 et seq. (setting out additional responsibilities of the KCHR with regard to dependent children). Of course, whether defendants violated any of their duties imposed by statute or regulation is collateral to our initial inquiry whether there was a clearly established right to sue defendants under section 1983 for violations of the Fourteenth Amendment's Due Process Clause alleged here. Cf: Davis v. Holly, 835 F.2d 1175, 1179 (6th Cir.1987)
 
 
 [5]
 The complaint also set out two pendent state claims: general negligence on the part of the defendants and negligent compliance with statutory duties. These claims were not addressed below, and we do not consider them on appeal
 
 
 [6]
 We may also look to the decisions of the highest state court in the state where the case arose. Robinson v. Bibb, 840 F.2d 349, 351 (6th Cir.1988)
 
 
 [7]
 Thus, the complaint does not assert that any overt affirmative action by any individual defendant was directly abusive of the child or resulted in the exacerbation of his underlying condition. Cf. DeShaney v. Winnebago County Dep't of Social Services, --- U.S. ----, 109 S.Ct. 998, 1006 n. 8, 103 L.Ed.2d 249 (1989) (citing cases). See also Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)
 
 
 [8]
 Eugene's complaint does not allege that any Kentucky statute gave him an "entitlement" to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection against state deprivation under Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)
 
 
 [9]
 While we do not consider the question of whether the right alleged by Eugene is "clearly established" as of the date of this opinion, we note that the Second Circuit's analysis has been adopted by courts of other circuits. See, e.g., Taylor v. Ledbetter, 818 F.2d 791 (11th Cir.1987); B.H., C.H., J.E. and C.Z. v. Johnson, 715 F.Supp. 1387 (N.D.Ill.1989). As noted above, the Supreme Court has not yet addressed this question. See DeShaney, 109 S.Ct. at 1006 n. 9
 
 
 [10]
 We note that the Seventh Circuit has reached a similar conclusion in an appeal covering a later time period. In Doe v. Bobbitt, 881 F.2d 510 (7th Cir.1989), the court concluded that the Second Circuit's "novel analogy between incarceration and placement in a foster home" was not sufficient to have clearly established in 1984 that the "public official who places a child at risk of harm from private individuals in a foster home violated that child's constitutional rights." Id. at 512
 
 
 [1]
 The classic statement of the positivist position is found in the statement of Justice Holmes:
 If you want to know the law and nothing else, you must look at it as a bad man who cares only for the material consequences which such knowledge enables him to predict, not as a good one, who finds his reasons for conduct, whether inside the law or outside of it, in the vaguer sanctions of conscience.
 ....
 I am much of his mind. The prophecies of what the courts will do in fact, and nothing more pretentious, are what I mean by the law.
 Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 459-61 (1897).