**Thomas HARPER, etc., Plaintiff, Appellant,**

**v.**

**Robert CSERR, M.D., etc., Defendant, Appellee.**

**No. 76–1276.**

United States Court of Appeals, First Circuit.

Submitted Aug. 30, 1976.

Decided Nov. 19, 1976.

Leslie E. Bloomenthal, Sisson & Sarrouf, and Howard J. Alperin, Boston, Mass., on brief for appellant.

Francis X. Bellotti, Atty. Gen., and W. Channing Beucler, Asst. Atty. Gen., Boston, Mass., on brief for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This appeal is from the district court's dismissal, for failure to state a claim upon which relief may be granted, of a damages action brought under 42 U.S.C. §§ 1983 and 1988, with pendent state claims for wrongful death. It is alleged in the complaint that plaintiff's wife, Marilyn J. Harper, a voluntary patient at Medfield State Hospital in Massachusetts, hung herself after a long history of prior suicide attempts, including two such attempts at Medfield. The defendant Superintendent's purported failure to supervise her movements or take any steps to prevent her taking her own life was claimed to have violated the due process clause of the fourteenth amendment and the prohibition against the infliction of cruel and unusual punishment in the eighth amendment. In dismissing, the court said that the "Civil Rights Act does not create a general federal law of torts."

██ In reviewing the disposition of a motion to dismiss, we consider only those facts and allegations set forth in the complaint and must view them in a light most favorable to the plaintiff. A complaint should be dismissed only if plaintiff is not entitled to relief under any set of facts he could prove. *Conley v. Gibson,* 355 U.S. 41, 45–6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); 2A Moore's Federal Practice § 12.08 at 2271, 2274. For plaintiff to have established a claim cognizable under § 1983, he must show that the defendant, Dr. Robert Cserr (the superintendent of Medfield), under color of state law, deprived Marilyn Harper of a right secured by the Constitution of the United States; and to recover damages he must also establish the requisite knowledge or malice on defendant's part. We conclude, tentatively, that while, as the court below held, § 1983 does not create a general federal law of torts, the complaint could conceivably encompass a federal cause of action for damages should plaintiff be able to establish a malicious or wanton dereliction of duty on the part of the state defendant as opposed to a mere negligent failure to afford proper treatment. It should not, therefore, have been dismissed under Rule 12(b).

I

The question of whether or not plaintiff has a federal cause of action at all is not free from doubt, and the following discussion, in which we conclude that a voluntary inmate in a state institution, or her representative, may in some circumstances have a cause of action under § 1983 for malicious or wanton maltreatment or neglect, cannot be regarded as more than tentative in the present state of the law. However, we think the likelihood sufficient to entitle plaintiff to develop the facts, if he so desires, beyond the pleading stage.

██ First, we reject the argument that plaintiff can claim for the deceased a "right to treatment" under such cases as *Wyatt v. Aderholt,* 503 F.2d 1305, 1312 (5th Cir. 1974); *see Rouse v. Cameron,* 125 U.S.App. D.C. 366, 373 F.2d 451, 453 (1966); Note, Right to Treatment, 86 Harv.L.Rev. 1282 (1973). Marilyn Harper was a voluntary patient, and it is not suggested that if she or her legal or natural guardian wished her

to leave Medfield State Hospital, the state would have detained her assuming usual procedures were followed. Whether the state might have instituted proceedings to alter her status from voluntary to involuntary is purely speculative. The rationale of the above "right to treatment" cases is that treatment must be afforded in order to legitimate the inmate's continued detention which (given the nature and purpose of civil commitment proceedings) might otherwise amount to a deprivation of liberty without due process or the infliction of cruel and unusual punishment within the eighth amendment. *Rouse v. Cameron, supra.* Cf. *O'Connor v. Donaldson,* 422 U.S. 563, 573–76, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1974). Here, however, since the deceased was not involuntarily committed, such a *quid pro quo* analysis is not germane, and since she was free to leave at any time, there is no question of an "indefinite detention" which, minus treatment, becomes cruel and unusual punishment. These considerations are ably discussed by Judge Judd in *New York State Association for Retarded Children, Inc. v. Rockefeller (Rockefeller),* 357 F.Supp. 752, 758–62 (E.D.N.Y.1973). In any event, we find no support for plaintiff's complaint in the "right to treatment" line of cases predicated on the rationale described in *Rouse v. Cameron, supra.*

A different theory, however, which has been suggested though not fully developed in several cases, is more in point. In *Spence v. Staras,* 507 F.2d 554 (7th Cir. 1974), the court held that a cause of action under § 1983 was stated against agents and employees of a state hospital upon allegations that they failed to protect plaintiff's son, who was nonverbal, against a fatal beating administered by a fellow inmate. It was alleged that prior to the fatal beating, the son had been assaulted on twenty occasions known to defendants, who knew that he could not call for help and was a frequent target for such assaults. The court said it was "clear that the deceased had a right, under the Fourteenth Amendment, to be secure in his life and person while confined under state authority." *Id.* at 557. It cited two district court cases, in both of which reference is made to a right, "whether grounded on due process or the Eighth Amendment, or both, to a humane and safe living environment while confined under State authority." *Welsch v. Likins,* 373 F.Supp. 487, 502–3 (D.Minn.1974); *Rockefeller, supra,* 357 F.Supp. at 764–65. In *Rockefeller,* the patients were "voluntarily" confined in that the state asserted no right to retain them in its custody, although as the court pointed out they were incapable of voluntary waiver and were, in fact, locked in. Protection from the assaults of fellow inmates, the provision of basic hygienics, food and heat, and the like, were the sort of elemental necessaries which the court said the state had to provide. *Rockefeller, supra,* at 764–65. No treatment right in any more inclusive sense was suggested. Judge Judd commented that institutionalized retarded residents held "behind locked gates and . . . without the possibility of a meaningful waiver of their right to freedom, . . . must be entitled to at least the same living conditions as prisoners". *Rockefeller, supra,* at 764.

While this approach is, on humane grounds, hard to fault, its constitutional basis has yet to be defined, especially with respect to inmates whom the state claims no right to confine. In the case of voluntarily committed persons, it would seem limited to those who by reason of disability are to a great degree helpless; and, if not confined *de jure,* are at least confined *de facto.* A prisoner or involuntary mental patient has no alternative to enduring whatever conditions the state provides; if his captors allow him to be beaten or consign him to inhuman conditions, it seems rational to speak not only of a "tort" but an invasion of civil rights by his captors. A voluntary patient, on the other hand, is legally not forced to endure the conditions although, depending on his degree of disability, the availability of other resources and of parents, spouses, friends and guardians, and so on, he may or may not be compelled *de facto* to endure the conditions.

■ It is difficult to draw from the foregoing any final conclusions about plaintiff's

case, knowing as little as we do about the terms of the deceased's voluntary commitment, her degree of helplessness, and the relative degree of neglect, if any, which resulted in her death. If the deceased was relatively competent, it may be that she would not come within the right to protection doctrine at all. It is also possible that after a more complete development of the facts, it would become apparent that defendant did afford a basically humane and safe living environment, and that any failure to treat or restrain the deceased goes beyond that issue, and is more a complaint as to negligence or malpractice, for which § 1983 would not afford relief.[1] We think, however, that the facts recited by plaintiff—including the allegation that deceased disappeared from her quarters two or three days prior to the discovery of her body and that her disappearance went unnoticed[2] —go far enough to require allowance of some evidentiary input at least. If plaintiff could establish a sufficient combination of helplessness on the part of deceased, and wanton callousness on the part of those caring for her, her case might cross the line from tort to a § 1983 case stating a claim under the eighth amendment or possibly even the due process clause of the fourteenth. We accordingly hold that the complaint cannot be said on its face not to state a federal cause of action.

## II

■ Even assuming a cause of action may exist under § 1983, it does not follow that plaintiff may recover damages. The Supreme Court has recently addressed the

question of the standard for allowance of damages, and in *O'Connor v. Donaldson, supra,* applied the relevant test in a case arising from the illegal detention of an involuntarily confined mental patient. Justice Stewart, writing for the majority, held that in confining the plaintiff, a non-dangerous person, the superintendent had violated the patient's constitutional rights. However, the Court indicated that the question of monetary damages may not have been properly decided. The test the Supreme Court sets out is the standard applicable in the present lawsuit:

"... the relevant question ... is whether [Dr. Cserr] 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [Mrs. Harper], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [Mrs. Harper].' [*Wood v. Strickland,* 420 U.S. 308 at 322, 95 S.Ct. 992, 43 L.Ed.2d 214]. See also *Scheuer v. Rhodes,* 416 U.S. 232, 247–248, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90; *Wood v. Strickland, supra,* 420 U.S. at 330, 95 S.Ct. at 1005 (opinion of Powell, J.). For purposes of this question, an official has, of course, no duty to anticipate unforeseeable constitutional developments. *Wood v. Strickland, supra,* at 420 U.S. 322, 95 S.Ct. at 1004." *O'Connor v. Donaldson, supra,* 422 U.S. at 577, 95 S.Ct. at 2494.

*See also Hoitt v. Vitek,* 497 F.2d 598, 602 (1st Cir. 1974).

■ Since the constitutional right of the deceased to be free from harm is by no

---

1. The Supreme Court has recently gone far to indicate that § 1983 is not a means of ordinary redress for the unintentional infliction of death by a state official, and is not meant to displace or duplicate the tort law of the states. Mr. Justice Rehnquist, writing for a substantial majority of the Court, emphasized in *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976), that the fourteenth amendment was not "a font of tort law to be superimposed upon whatever systems may already be administered by the States." He indicated concern lest "the survivors of an innocent bystander mistakenly shot by a policeman

or negligently killed by a sheriff driving a government vehicle" be thought to have claims under § 1983. *Id.* at 698, 96 S.Ct. at 1159.

2. We note that Dr. Cserr strongly denies these and other allegations of the complaint in his affidavit, but we cannot consider any documents outside of the complaint on review of the present dismissal. It may well be that on a motion for summary judgment the defendant should and will prevail. We express no opinion, as to future disposition, one way or the other.

means certain, and in the present nascent stage of the law could not have been foreseen, the defendant plainly had no reason to know whether or not what he did would be a constitutional violation. As for malicious intention, it was not alleged. However, the complaint does allege that:

". . . no effort was made to restrict Mrs. Harper's activities or to control her movements or to provide for her safety or welfare. Mrs. Harper was permitted to come and go about the premises unattended and was permitted free and easy access to dangerous implements, tools and other instrumentalities potentially dangerous and harmful to her. She was not watched, supervised or afforded the protection and security of the hospital, its staff and facilities."

We cannot say that if these allegations were all proven that a trier of fact might not be in a position to infer such a degree of wanton neglect as would be tantamount to actual malice. See Kelley v. Dunne, 344 F.2d 129, 133–34 (1st Cir. 1965) (Aldrich, C. J.); Commonwealth v. Welansky, 316 Mass. 383, 397–401, 55 N.E.2d 902, 909–11 (1944). Plaintiff has, we think, set forth enough to enable him to attempt to show more explicitly that he can meet the required standard, although, of course, if upon further proceedings it becomes obvious that he cannot do so, the district court will be empowered and obliged to dismiss. The facts must be developed upon which such a determination can be made. As the Supreme Court held in Scheuer v. Rhodes, supra, 416 U.S. at 250, 94 S.Ct. at 1693:

"Further proceedings, either by way of summary judgment or by trial on the merits, are required. The complaining parties are entitled to be heard more fully than is possible on a motion to dismiss a complaint."

### III

Our determination that the claim under § 1983 should not have been dismissed on the pleadings requires us to consider the status of the pendent state tort claims in the complaint. If it should turn out that the federal claim is not frivolous, the district court may well have responsibility to decide the state claims. Hagans v. Lavine, 415 U.S. 528, 545, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1973). On the other hand, further factual development of the federal claim could indicate that it is so hopeless as to make it inappropriate for the district court to resolve the pendent claims. And, of course, there may be other valid reasons of which we are presently unaware—the question never having been briefed and argued before us—that might justify the district court in refusing to decide the pendent state claims.

If the district court should reach the pendent claims, we can say no more than the following by way of partial guidance:

While Massachusetts precedent indicates that tort recovery in a case like this could be predicated on a finding of ordinary negligence as well as active misfeasance, it is clear that twenty years ago the state courts did not take kindly to claims of this sort. Somers v. Osterheld, 335 Mass. 24, 25–26, 138 N.E.2d 370, 372 (1956). Indeed, our initial reading of Somers was that it foreclosed recovery here; however, upon considering recent developments in Massachusetts tort law during the intervening period, we find ourselves less certain. In 1973, the Supreme Judicial Court abolished the licensee-invitee distinction and created a standard of reasonable care in all the circumstances. Mounsey v. Ellard, 363 Mass. 693, 707, 297 N.E.2d 43, 52 (1973). 1974 saw the Court, inter alia, abandon "the traditional common law distinction between acts of 'misfeasance' and 'nonfeasance,' with resulting liability for acting negligently but not for failing or refusing to act at all, with reference to a person who is in peril and helpless." Pridgen v. Boston Housing Authority, 364 Mass. 696, 308 N.E.2d 467, 475–77 (1974). See also McDonough v. Whalen, 365 Mass. 506, 313 N.E.2d 435, 438 (1974) (overruling Cunningham v. T. A. Gillespie, 241 Mass. 280, 135 N.E. 105 (1922), which held that a builder was not liable to persons with whom he has no contractual relation-

ship, if the work is completed and accepted by the owner before injury); *Sorensen v. Sorensen*, Mass., 339 N.E.2d 907 (1975) (abandoning parent-child immunity in negligence actions). Finally, there are the recent decisions of the United States Supreme Court, already referred to, emphasizing that the immunity of public officials is less than absolute, and depends on a variety of circumstances, encompassed within the general guidelines of

> "the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based." *Scheuer v. Rhodes, supra*, 416 U.S. at 247–48, 94 S.Ct. at 1692, *cited approvingly in Wood v. Strickland, supra*, 420 U.S. at 318, 95 S.Ct. 992; *O'Connor v. Donaldson, supra*, 422 U.S. at 577, 95 S.Ct. 2486.

This standard, although not binding upon a state court, suggests the probability that a court today would review many more factors than did the *Somers* Court in determining whether a state official's discretion was exercised reasonably.

In light of the above, if the district court determines that it should proceed to decide the state claims, it may want to consider certification of the controlling legal issue to the Supreme Judicial Court. This would be, however, a matter within its discretion and we do not intimate that it would be the only course open.

The first step, in any event, will be for the district court to require the plaintiff, through affidavits, discovery or both, to clarify the factual basis of his claims so that it may be determined whether there exists any reasonable basis for recovery under federal law. In vacating the judgment below, we do not signify that plaintiff's federal claim, when its dimensions are better revealed, will necessarily prove substantial, nor do we mean necessarily to guarantee a federal forum for the trial of the pendent state tort claims.

*The judgment of the district court is vacated and the case remanded for further proceedings consistent with this opinion.*