**William DAWSON, Plaintiff–Appellant,**

v.

**MILWAUKEE HOUSING AUTHORITY, et al., Defendants–Appellees.**

No. 90–2902.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1991.

Decided May 1, 1991.

Michael J. Backes, Milwaukee, Wis., for plaintiff-appellant.

Jeffrey Schmeckpeper, Kasdorf, Lewis & Swietlik, Milwaukee, Wis., for defendants-appellees.

Before CUMMINGS, FLAUM, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

William Dawson and Merrill Derosier did not get along. They disagreed about whether Dawson should remain friends with a particular woman. The irascible Derosier had a reputation for violence. He made good on that reputation the evening of December 22, 1987, when he shot Dawson in the abdomen. Dawson spent the next ten months in a hospital and will never recover fully.

Derosier is in no position to make good Dawson's losses. Both men were residents of public housing in Milwaukee at the time of the shooting. They lived in the Riverview Housing Development when the animosity developed. Dawson complained to officials of the Milwaukee Housing Authority about Derosier's threats. They took

these threats seriously; Derosier had been convicted of stabbing another tenant. The Housing Authority moved Derosier from Riverview to another development seven blocks away. When Derosier persisted in hassling Dawson, the Housing Authority promised to move Dawson too. It did not follow through, even though an apartment became available before the shooting. (So the complaint alleges, and we take its allegations as true.) On December 19, 1987, a state court ordered Derosier to stay away from Dawson. The court's edict, like Derosier's eviction, came to naught.

Dawson contends that the Housing Authority and three of its employees violated his rights under the due process clause of the fourteenth amendment. As Dawson sees things, Wisconsin owed him *safe* housing and did not deliver. This argument founders on the language of the due process clause: "nor shall any *State* deprive any person of life, liberty, or property, without due process of law" (emphasis added). The state did not shoot Dawson; Derosier did. Dawson believes that the state should have done more to protect him from Derosier, but a state need not "protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). The district court, citing *DeShaney,* dismissed Dawson's complaint under 42 U.S.C. § 1983 for failure to state a claim on which relief may be granted and dismissed his pendent state claims without prejudice.

Because the case was dismissed on the pleadings, we shall assume that the Housing Authority's decision played some causal role in Dawson's injury. The assumption is heroic because even if the Authority had tightened security considerably or moved Derosier (or Dawson) to the other side of town, Derosier could have tracked Dawson down and shot him off the Authority's premises. Derosier carried a grudge against Dawson; this was not violence against a stranger selected only because of his presence in public housing. Let the matter pass. Dawson deploys two arguments in an effort to attribute Derosier's violence to the state, and so satisfy *DeShaney.* One is that Milwaukee had him in the functional equivalent of custody, the other that Wisconsin's statutes promised him safe housing.

1. "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs —*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the ... Due Process Clause." *DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1005–06. We stated the proposition more broadly in *Archie v. Racine,* 847 F.2d 1211, 1222–23 (7th Cir.1988) (in banc), observing that the state may restrain indirectly as well as directly— by suppressing private alternatives as well as by preventing self-help. So although a state need not provide competent rescue services (the holding of *Archie* ), it may violate the Constitution by blocking private rescuers from lending aid. *Ross v. United States,* 910 F.2d 1422, 1431 (7th Cir.1990). See also *K.H. v. Morgan,* 914 F.2d 846, 848–49 (7th Cir.1990).

Yet Wisconsin did not take Dawson into custody or suppress the private housing market. Dawson entered the Riverview Housing Development of his own choice and could depart on whim. Most housing in Milwaukee is in private hands; the state has not stunted alternatives to its services. Public housing is less expensive than private housing; the subsidy is both its *raison d'être* and its distinguishing feature. One could say that impecunious persons "have no choice" but to accept the state's offer—although this colloquialism is embarrassed by the fact that more than 80% of poor persons live in private housing. See *Statistical Abstract of the United States 1990* Table 579, showing that of the 11.95 million American households defined as poor in 1987, only 2.25 million, or 18.9%, lived in public housing. (Of the 79.12 million households above the poverty threshold, 1.73 million lived in public housing.)

When asking whether Dawson's presence in Riverview was custodial, we do not

inquire whether Dawson's lack of resources restricted his options. That would be the right question if the Constitution required the government to furnish essential services, or to fund the exercise of constitutionally protected rights, but it does not. E.g., *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988). There is a gulf between poverty and custody. We ask instead whether the state offered Dawson a choice among lawful alternatives, giving him the opportunity to elect whichever he believed superior. *Walker v. Rowe*, 791 F.2d 507 (7th Cir.1986). Cf. *Henn v. National Geographic Society*, 819 F.2d 824 (7th Cir. 1987). As the government was entitled under the Constitution to remit Dawson to his own resources and the private market for housing, the additional option of subsidized (but risky) public housing made him better off. Neither was perfect; we may assume that neither was particularly desirable; but the offer of unsafe public housing did not cause Dawson's position to deteriorate.

Unless any offer of subsidized services is to be treated the same as custody, Dawson must lose. But why equate subsidy with custody? Both *DeShaney* and *Archie* explain that the due process clause is designed to guard against excesses of governmental power. Its function is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *DeShaney*, 489 U.S. at 196, 109 S.Ct. at 1003. See also *Archie*, 847 F.2d at 1220–23. Persons who can protect themselves by declining the government's offer present none of the concerns animating the constitutional rule. A belief that the government's offer should have a higher component of safety—almost certainly accompanied by a higher price for a given apartment—is a substantive argument for consideration by the political branches. If those accountable to the people serve up an unpalatable concoction, they will pay the price.

Safety in the public workplace presents a close parallel to our case. The state offers employment for a wage. Lure of money induces people to take the positions. Must the government assure the safety of those it has enticed into its employ? Anticipating *DeShaney*, we held not in *Walker*. Government is the art of compromise, including striking the balance between cost and quality. More police means fewer schools and parks. Money spent on safety is unavailable for salaries. Different governments—different groups of employees—may prefer a different mix. Even if a court could determine the best mix from employees' perspective, highly dubious to start with, it could not identify a constitutional rule compelling the government to offer safety rather than money, or shorter work weeks, or better pensions, or any of the other variables that make up the set of benefits. Public and private employers may design their packages, and would-be employees may choose among competing offers. "Having decided that the combination of pay, benefits, and safety is satisfactory, the [employees] cannot turn around [after they are injured] and say that the constitution required that safety be a larger component of the total package. The constitution no more assures a safe job than it does a job with a generous salary." 791 F.2d at 510.

What is true of persons attracted to public employment by a high wage or protection from layoffs—and persons who use a local government's rescue service because it is free, as in *Archie*—is no less true of persons attracted to public housing by low rent or spacious quarters. Money spent on guards or elaborate security systems or frequently moving quarrelsome tenants is unavailable for paint, plumbing, and elevator repair. Public officials may choose a mix, and the citizens then may choose where to live. Three courts of appeals stand with *Walker* in holding that the due process clause does not require safe places to work. *McClary v. O'Hare*, 786 F.2d 83 (2d Cir.1986); *Rankin v. Wichita Falls*, 762 F.2d 444 (5th Cir.1985); *Washington v. District of Columbia*, 802 F.2d 1478 (D.C. Cir.1986). The eighth circuit has gone the other way, *Ruge v. Bellevue*, 892 F.2d 738

(8th Cir.1989), and *Ruge*'s principles logically apply to public housing as well as public employment. *Collins v. Harker Heights*, 916 F.2d 284 (5th Cir.1990), cert. granted, —— U.S. ——, 111 S.Ct. 1579, 113 L.Ed.2d 644 (1991), may decide whether *Ruge* is correct. *Walker* stands for the proposition that it is not, and nothing in the eighth circuit's opinion (which does not mention *Walker*) persuades us otherwise.

2. *DeShaney* reserved the question whether state laws requiring social workers to protect children create a liberty interest, of which the children may not be deprived without hearings. 489 U.S. at 195 n. 2, 109 S.Ct. at 1003 n. 2. See *Doe v. Milwaukee County*, 903 F.2d 499 (7th Cir. 1990) (answering that particular question in the negative). Dawson makes a parallel argument: that Wisconsin requires local officials to establish safe and sanitary public housing, Wis.Stat. § 66.40, which creates a legitimate claim of entitlement. The Housing Authority reads the law differently from Dawson, but we need not decide whose reading is correct.

To the extent Dawson submits that a substantive guarantee of safety in the statute entitles him to protection from other tenants, he is arguing that the Housing Authority violated state law. Federal courts do not enforce state law in the name of the Constitution. *DeShaney*, 489 U.S. at 202, 109 S.Ct. at 1006; *Archie*, 847 F.2d at 1215–18. To the extent Dawson believes that he had an entitlement to safe housing that the state could not take away without notice and an opportunity for a hearing, he neglects the fact that the Housing Authority's decision to set a particular target level of safety is not person-specific. It is a legislative rather than adjudicative decision, and the due process clause does not require individual hearings before a governmental body takes decisions that affect the interests of persons in the aggregate. *Atkins v. Parker*, 472 U.S. 115, 129–31, 105 S.Ct. 2520, 2528–30, 86 L.Ed.2d 81 (1985); *Bi–Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915). If the state fails to achieve the level it set for itself, that shortfall is again a substantive problem under state law, and Dawson's claim belongs in state court, to which the district judge's decision has sent it. Finally, to the extent Dawson contends that the Housing Authority neglected to follow through on a promise to move him farther away from Derosier, he has again identified only a departure from the norms the government set for itself, and the opportunity to obtain redress in state court is all the process "due" for unauthorized, unpredictable, gaffes by public officials. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Easter House v. Felder*, 910 F.2d 1387 (7th Cir.1990) (in banc).

Cases such as this tug at the heartstrings. Dawson, an elderly resident of Milwaukee, should not have to live out his life in pain. But if the Constitution "does not enact Mr. Herbert Spencer's Social Statics", see *Lochner v. New York*, 198 U.S. 45, 75, 25 S.Ct. 539, 546, 49 L.Ed. 937 (1905) (Holmes, J., dissenting), it also does not enact Gunnar Myrdal's *American Dilemma*. Safety, like other measures of the welfare state, is not free. Judicial directives to devote more resources to safety do not *create* more resources. They reallocate resources. States will respond by offering less public housing, or less commodious apartments, or skimping on repair, or raising rents, or raising taxes (which means higher rents in all housing). They may respond by evicting tenants more quickly or being persnickety about who they will accept. Change will make some tenants better off and others worse off. The losers as well as the winners are apt to be poor, black, elderly, or all three. There are no free choices, and therefore no easy ones. Nothing in the Constitution commits such choices affecting state and local operations to tenured officials of the federal government. The enduring need to strike and revise the balance among vital interests and aspirations of the people is why the Constitution establishes a republican form of government.

AFFIRMED.