United States Court of Appeals,

Fifth Circuit.

No. 93-7313.

Joseph WALTON, as next friend of Christopher Walton, a minor, Plaintiff-Appellee,

v.

Alma ALEXANDER, et al., Defendants,

Alma Alexander, Defendant-Appellant.

May 19, 1994.

Appeal from the United States District Court for the Northern District of Mississippi.

Before POLITZ, Chief Judge, GARWOOD, Circuit Judge, and PARKER[*], District Judge.

ROBERT M. PARKER, District Judge:

Plaintiff-appellee Joseph Walton filed this action on behalf of his son Christopher Walton (Walton), a student at the Mississippi School for the Deaf, against Defendant-appellant Dr. Alma Alexander (Alexander), former superintendent of the Mississippi School for the Deaf, alleging violations of 42 U.S.C. § 1983. Alexander moved for summary judgment on the basis of qualified immunity. The District Court denied her motion, and she is before this Court on interlocutory appeal of that order as is her right under *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). For the reasons set out below, we REVERSE.

STANDARD OF REVIEW

Review of a district court's ruling on a motion for summary

---

[*]Chief Judge of the Eastern District of Texas, sitting by designation.

judgment is plenary. *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 79 (5th Cir.1987). Although review is *de novo,* the court of appeals applies the same standards as those that govern the district court's determination. *Jackson v. Federal Deposit Ins. Corp.,* 981 F.2d 730, 732 (5th Cir.1992). Summary judgment must be granted if the court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). To determine whether there are any genuine issues of material fact, the court must first consult the applicable substantive law to ascertain what factual issues are material. The moving party bears the burden of coming forward with proof of the absence of any genuine issues of material fact through the identification of those portions of the pleadings, depositions, answers to the interrogatories, and admissions on file, together with any affidavits which it believes demonstrates the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmovant is then required to counter the motion for summary judgment. FED.R.CIV.P. 56(e). "[M]ere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Nicholas Acoustics, Etc. v. H & M Const. Co., Inc.,* 695 F.2d 839, 844 (5th Cir.1983) (quoting *Liberty Leasing Co. v. Hillsum Sales Corp.,* 380 F.2d 1013, 1051 (5th Cir.1967)). The court must then review all evidence bearing on those issues, viewing the facts and inferences in the light most

2

favorable to the nonmoving party. *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167 (5th Cir.1990).

## FACTS

During the latter part of 1987, while he was a student at the Mississippi School for the Deaf (the School), Walton was sexually assaulted by a fellow student. This assault was reported to school officials, including Alexander, who filed a report with the Mississippi Department of Welfare. Pursuant to the School's policies implemented by Alexander, both the School and the Mississippi Department of Welfare investigated the assault. The School called its discipline committee to counsel both students and to contact each student's parents regarding the assault. Walton was also provided with medical treatment by the School's physician. Walton and his assailant were suspended from the School campus for three days, which Alexander believed to be the maximum punishment allowed under a consent decree from an unrelated class action settlement, *Mattie T. v. Holiday*[1].

Upon return from suspension, Alexander contends both Walton and his assailant were given psychological consultation by the School's psychologist. On the other hand, Walton contends that after returning to the School he did not receive any counseling or instructions as to how to protect himself from further assault. Alexander recalls that in addition to counseling, the two students were placed in separate dormitories. Walton alleges, however, that Alexander took insufficient measures to shield him from the

___

[1]Civil Action No. DC-75-31-S (N.D.Miss.1979).

3

assailant after returning from suspension. The law is clear that the court cannot consider mere general allegations of fact in response to a motion for summary judgment. Therefore, we find Alexander's efforts to separate Walton from his assailant to be undisputed. By the fall of 1988, budgetary constraints imposed by the State of Mississippi forced the School to close all but one male dormitory. Consequently, Walton and his assailant were placed in the same dormitory. Walton was assigned a special dormitory room with a private bath, which was intended to keep Walton out of the bathrooms with other male students. Walton contends that the assailant was allowed unrestricted access to him in 1988, and he was again sexually assaulted by the same student. However, Alexander was not informed of the second assault. Thereafter, Walton filed the present action under 42 U.S.C. § 1983, alleging a Fourteenth Amendment violation based on Alexander's failure to protect Walton from the sexual assault of the offending fellow student.

## QUALIFIED IMMUNITY

Appellant contends that the district court erred in denying her summary judgment because she was entitled to qualified immunity as a matter of law.

State officials are protected by qualified immunity for alleged constitutional torts if their conduct does not violate clearly established law effective at the time of the alleged tort. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Therefore, the first step in examining a defendant's claim

4

of qualified immunity is to determine whether the plaintiff has "alleg[ed] the violation of a clearly established constitutional right." *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987).

Walton's amended complaint alleges that he was deprived of his "right to be free from sexual assault while attending school at the Mississippi School For the Deaf " in violation of his substantive due process right to bodily integrity. A substantive due process right, as opposed to a procedural due process right, is one either listed in the Bill of Rights or one held to be so fundamental that a state may not take it away. See generally, *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

Although the Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law," nothing in the language of the clause itself requires a state, or its officials, to protect the life, liberty, and property of persons within its borders against the actions of private actors. Courts have declined to recognize as a general rule a person's affirmative right to state protection, even when such protection may be necessary to secure life, liberty, or property interests. See

5

*DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989); see also *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982). Following this reasoning, the U.S. Supreme Court has concluded that, as a general matter, "a State's[2] failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. at 197, 109 S.Ct. at 1004.

However, in certain limited circumstances, when a "special relationship" exists between a state official and a particular individual, the state official is imposed with a duty to protect that particular individual, thereby creating a constitutional right to care and safety. See generally *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (holding that the State is required to provide adequate medical care to incarcerated prisoners). For example, in *Youngberg v. Romeo, supra,* the U.S. Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires a state, through its officials, to provide for the reasonable safety and care of involuntarily committed mental patients. *Id.* at 314-325, 102 S.Ct. at 2457-2463. *Estelle* and *Youngberg* stand for the proposition that when a state holds a person against his will, the Constitution imposes a duty upon the

---

[2]The U.S. Supreme Court's use of the term "State" is meant to refer to state and local governmental entities and their agents. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. at 195, n. 1, 109 S.Ct. at 1002, n. 1.

state and its officials to assume the responsibility for that person's safety and well-being. *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. at 200, 109 S.Ct. at 1005. This duty arises from the limitations that have been imposed on the individual's freedom to act on his own behalf. *Id.* at 200, 109 S.Ct. at 1006; *see also Estelle v. Gamble, supra* at 103, 97 S.Ct. at 290.[3] These cases leave open "the possibility that the duty owed by a state to prisoners and the institutionalized might also be owed to other categories of persons in custody by means of "similar restraints of personal liberty.' " *D.R. by L.R. v. Middle Bucks Area Vo. Tech. School,* 972 F.2d 1364, 1370 (3d Cir.1992) (en banc), *cert. denied,* --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993) (quoting *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. at 200, 109 S.Ct. at 1006).

Appellant contends that no "special relationship" exists between herself and Walton because his voluntary enrollment at the School does not place him within a category of persons recognized by law in 1987 and 1988 as involuntarily committed to state

---

[3]Some courts have also imposed a constitutional duty to protect foster children by analogy to involuntary institutionalized individuals. See *Yvonne L., By and Through Lewis v. New Mexico Dept. of Human Services,* 959 F.2d 883, 893 (10th Cir.1992); *Taylor By and Through Walker v. Ledbetter,* 818 F.2d 791 (11th Cir.1987), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *Doe v. New York City Dept. of Social Services,* 649 F.2d 134 (1981), after remand, 709 F.2d 782 (2d Cir.), *cert. denied sub nom., Catholic Home Bureau v. Doe,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). A special relationship is also recognized in cases involving a child removed from his home and placed under state supervision. See *Griffith v. Johnston,* 899 F.2d 1427, 1439 (5th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

custody. Appellant primarily relies on the opinion in *D.R. By L.R. v. Middle Bucks Area Vo. Tech. School, supra,* in which the Third Circuit held that a school official's authority over a special education day student does not create the type of physical custody necessary to establish a special relationship between the official and the student due to the fact that both the student and her parents retain substantial freedom to act. *D.R. by L.R.,* 972 F.2d at 1373. The Court reasoned that because the students were able to return home at the end of the school day, their parents remained their primary caretakers. *Id.* The Court noted, however, that in those cases in which a duty was imposed, the state assumed "an important, continuing, if not immediate, responsibility for the child's well-being" due to the fact that the child's placement in state custody rendered him or her dependent upon the state to meet the child's basic needs. *Id.* at 1372.

There are several factors that exist in this residential special education school which distinguish this case from those cases involving students who attend day classes, as in *D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, supra.* For example, the School had twenty-four (24) hour custody of Walton, a handicapped child who lacks the basic communications skills that a normal child would possess. Because its students are handicapped, the School has to enforce strict rules that impact on what the students can and cannot not do. Obviously, Walton was not free to leave when he resided at the School. In addition, the economic realities of most Mississippi families are such that there is no other viable option

8

to them if they want their handicapped children to receive an education. The residential special education program provided by the State of Mississippi had a significant custodial component wherein Walton was dependent on the School for his basic needs and lost a substantial measure of his freedom to act. Therefore, we find that Walton falls within a category of persons in custody by means of "similar restraints of personal liberty," thereby establishing the existence of a "special relationship" between Alexander and Walton sufficiently clear by law in 1987 and 1988 to impose Alexander with a duty to provide Walton with reasonable conditions of safety. No reasonable superintendent in 1987 could have assumed she could have failed to take reasonable steps to protect the bodily integrity of one of her "special relationship" students.

Having established that Walton's constitutional right to bodily integrity and Alexander's duty with respect to that right were clearly established in 1987, when the first incident of sexual molestation occurred, we must determine whether, on the record before us, Alexander's failure to act or actions amounted to "deliberate indifference." In *Doe v. Taylor Ind. School Dist.*[4], this Court held that a school official's liability arises only at the point when the student shows that the official, by action or inaction, demonstrates a deliberate indifference toward his or her constitutional rights. *Taylor*, 15 F.3d at 454. The standard to be applied is not one of a guarantor or insurer of Walton's safety,

---

[4]15 F.3d 443 (5th Cir.1994).

but whether Alexander's actions provided reasonable conditions of safety, so as not to rise to a level of deliberate indifference. *Gonzalez v. Ysleta Independent School Dist.,* 996 F.2d 745, 761 (5th Cir.1993); *Jones v. City of Chicago,* 856 F.2d 985, 992-93 (7th Cir.1988) (rehearing denied) (holding that in order to violate a constitutional right, a defendant must act either knowingly or with deliberate, reckless indifference).

In *Taylor,* this Court adopted a test for determining personal liability of officials in physical sexual abuse cases. Although *Taylor* involved the physical sexual abuse of a student by an employee of the school, we can apply the same test to a "special relationship" student who is sexually molested or abused by a third party, which in this case is another student. A supervisory school official can be held personally liable for the violation of a "special relationship" student's constitutional right to bodily integrity in sexual molestation cases if the student establishes that:

(1) the defendant learned of facts or a pattern of sexual molestation or abuse by a third party pointing plainly toward the conclusion that the third party was sexually molesting or abusing the "special relationship" student; and

(2) the defendant demonstrated deliberate indifference toward the constitutional rights of the "special relationship" student by failing to take action that was obviously necessary to prevent or stop the abuse; and

(3) such failure caused a constitutional injury to the "special relationship" student.

*Taylor,* 15 F.3d at 454.

The evidence submitted by the plaintiff in this case clearly

10

establishes that soon after Walton was first molested in 1987, Alexander received a report from Walton of the incident. Alexander learned of facts sufficient to satisfy the first prong of the test. The evidence submitted also shows that Alexander did not respond with deliberate indifference. She filed a report to the Mississippi Department of Welfare; she personally investigated the assault; she provided Walton with medical treatment administered by the School's physician; she called the School's discipline committee to counsel both students and notify each student's parents; she suspended both students from the School campus for three days; and she separated Walton from his assailant as best she could under the circumstances created by the School's budgetary constraints. Alexander's actions may have been ineffective in halting the molestation, but her actions did not reflect that she was deliberately indifferent. Alexander provided reasonable conditions of safety to protect the bodily integrity of Walton. Therefore, as to the third prong of the test, no failure to act or action on her part had a causal connection with the second assault which occurred in 1988. Summary judgment should have been granted to Alexander on the grounds of qualified immunity.

CONCLUSION

The District Court's Order denying the Motion for Summary Judgment filed by superintendent Alexander is REVERSED.

GARWOOD, Circuit Judge, concurring specially:

I agree with the judgment of reversal, but am unable to join in the majority opinion.

11

This suit under 42 U.S.C. § 1983 seeks recovery of damages from appellant, now retired but then superintendent of the Mississippi School for the Deaf, for injuries suffered by one of its students, Christopher Walton (Walton), when sexually assaulted at the school by a fellow student, a private individual not acting under color of law or with any authorization, approval, or condonation by appellant or any other state actor. Appellant challenges the denial of her motion for summary judgment based on qualified immunity as well as on the assertion that there was no constitutional violation. In this setting, even if Walton were in such a "special relationship" to the state that the Constitution imposed on it (and appellant) the duty to take affirmative action to protect him from assault by private individuals not acting under color of law, *see DeShaney v. Winnebago County,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), nevertheless it is plain that appellant would not have violated any constitutional right of Walton's absent "deliberate indifference" on her part to his safety.

I agree with the majority's obviously correct holding that the absence of evidence sufficient to sustain a finding that appellant was deliberately indifferent to Walton's safety entitles her to summary judgment. And that is plainly true *whether or not* the state had a *DeShaney* "special relationship" to Walton while he attended its School for the Deaf. This case could, and should, have easily and simply been disposed of on that basis alone. However, the majority, quite unnecessarily, goes further and

12

purports to hold that Walton was in a *DeShaney* "special relationship" and that this was clearly established constitutional law in 1988. These rulings are, as a practical matter, largely insulated from further challenge because neither appellant nor Walton has any incentive to contest them.

I emphatically disagree both with the wholly unnecessary reaching of such constitutional issues and with the majority's resolution of them.

As to the former, it is settled that federal courts have a "strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration." *County Court of Ulster County v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979). This "responsibility to avoid unnecessary constitutional adjudication" is "a fundamental rule of judicial restraint." *Three Affiliated Tribes v. Wold Engineering,* 467 U.S. 138, 157, 104 S.Ct. 2267, 2279, 81 L.Ed.2d 113 (1984).[1] All this, of course, applies not only to the Supreme Court but to the lower federal courts as well. *See Bowen v. United States,* 422 U.S. 916, 920, 95 S.Ct. 2569, 2573, 45 L.Ed.2d 641 (1975) (in light of the proper

---

[1]*See also, e.g., Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985):

> " "Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.' [citations omitted]....' [i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.' [citation omitted]."

13

"reluctance to decide constitutional questions unnecessarily," the Court of Appeals, "having correctly decided that *Almeida-Sanchez* [*v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) ] did not apply to a 1971 search, ... should have refrained from considering whether our decision in that case applies to searches at checkpoints"). *See also Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985). The majority should not have disregarded the wise counsel of those and like cases.

As the majority has spoken—albeit unnecessarily—to whether this case presents a *DeShaney* special relationship, I feel compelled to likewise address that issue.

The key to the *DeShaney* "special relationship" is that it arises "when the State takes a person into its custody and holds him there against his will" and thus "by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." *Id.* 489 U.S. at 200, 109 S.Ct. at 1005. That is not the situation here. The State of Mississippi did not force Walton to attend the School for the Deaf or hold him there against his will. There is no evidence or allegation that attendance at the School for the Deaf is other than voluntary (or even that boarding there is something that the School requires of all who wish to enroll as students). Indeed, the record reflects that at all relevant times Walton had passed the age at which

14

Mississippi required attendance at *any* school.[2]

The majority infers that the School for the Deaf was the only educational opportunity practically available to Walton. That reasoning goes far beyond the *DeShaney* rationale, which is focused on compulsion "by the affirmative exercise of" state "power." Indeed, in this respect the majority seems to suggest that the state's failure to act—its supposed failure to provide other educational opportunities for the deaf—furnishes the required compulsion. But that is contrary to the very heart of *DeShaney's* rationale. *Id.* at 196, 109 S.Ct. at 1003.[3] *See also, e.g., Dawson*

---

[2]Walton's affidavit states that the first incident (as to which, apparently, recovery is not sought) occurred "in late 1987" and the other "in October 1988." Walton was born September 5, 1971, as reflected by the attachment to his affidavit, and was hence fifteen years of age on September 1, 1987, and sixteen years of age on September 1, 1988. For the school year 1987-1988, when the first incident occurred, Mississippi compulsory attendance applied only to those who had "not attained the age of" thirteen years "on or before September 1," 1987; for the school year 1988-1989, when the second incident occurred, Mississippi compulsory attendance applied only to those who had "not attained the age of" fifteen years "on or before September 1," 1988. Miss.Code § 37-13-91(2)(f)(ii) & (iii). Since Walton had attained the age of fifteen before September 1, 1987, he was not subject to compulsory school attendance during either the 1987-1988 or the 1988-1989 school years. It was not until the 1989-1990 school year that the compulsory attendance age included (as it does now) those who had "not attained the age of seventeen (17) years on or before September 1," 1989; however, by that time Walton would not have been covered because he had attained the age of seventeen on September 5, 1988.

[3]... [O]ur cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. *See, e.g., Harris v. McRae,* 448 U.S. 297, 317-318, 100 S.Ct. 2671, 2688-2689, 65 L.Ed.2d 784 (1980) (no obligation to fund abortions or other medical services) (discussing Due Process Clause of Fifth Amendment);

*v. Milwaukee Housing Authority,* 930 F.2d 1283, 1284-85 (7th Cir.1991). Moreover, the record simply does not support the majority. Appellant's supplemental affidavit filed below states:

> "the Mississippi School for the Deaf was not the only public deaf education facility in the State of Mississippi. In fact, handicapped educational facilities were available throughout the state, including deaf education facilities. The local school districts were obligated to provide handicapped educational facilities, including deaf educational facilities, so long as at least five handicapped students could be found in their district. Consequently, many such facilities were spread around the state.
>
> In addition, there were private deaf education institutions in the State of Mississippi.
>
> Indeed, students at the Mississippi School for the Deaf were there voluntarily. They and their parents were free to place them in either public or private educational facilities throughout the state and they were not obligated to attend the Mississippi School for the Deaf. They were free to enroll at the Mississippi School for the Deaf and they could withdraw at their option."

Mississippi law provides for special education programs in local schools for children with defective hearing, as well as for financial assistance for this purpose to such students attending private schools. See Miss.Code §§ 37-23-1—37-23-9; 37-23-61—37-23-73.

---

> *Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972) (no obligation to provide adequate housing) (discussing Due Process Clause of Fourteenth Amendment); see also *Youngberg v. Romeo, supra,* 457 U.S., at 317, 102 S.Ct., at 2458 ("As a general matter, a State is under no constitutional duty to provide substantive services for those within its border"). As we said in *Harris v. McRae:* "Although the liberty protected by the Due Process Clause affords protection against unwarranted *government* interference ..., it does not confer an entitlement to such [government aid] as may be necessary to realize all the advantages of that freedom.' 448 U.S., at 317-318, 100 S.Ct. at 2688-2689 (emphasis added)." *Id.*

16

The majority looks to *DeShaney's* footnote 9 and the foster home case cited in the majority's footnote 3. Again, however, the majority fails to observe the crucial distinguishing factor, made plain by the *DeShaney* footnote, namely state coercion: "Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id.* 489 U.S. at 201, 109 S.Ct. at 1006, n. 9. Here, Walton attended the School for the Deaf voluntarily and/or by the choice of his parents. Similarly, the cases cited in the majority's note 3 are all ones in which the state, by the affirmative exercise of its powers, has taken the child from its parents and involuntarily placed it in state custody and in the setting in which the injury arose.[4] In contrast, where

---

[4]In *Taylor By and Through Walker v. Ledbetter,* 818 F.2d 791 (11th Cir.1987), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 403 L.Ed.2d 808 (1989), a court order removed the child from the custody of her natural parents and put her in the custody of the state department, which then placed her with foster parents who injured her. *Id.* at 792. The Eleventh Circuit held this was analogous to *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), because "[i]n both cases, the state *involuntarily* placed the person in a custodial environment, and in both cases, the person is unable to seek alternative living arrangements." *Id.* at 795 (emphasis added). *Ledbetter* went on to say "[w]e hold that a child *involuntarily* placed in a foster home is in a situation so analogous to a prisoner ... that the foster child may bring a section 1983 action...." *Id.* at 797 (emphasis added). The same sort of situation was before the Tenth Circuit in *Yvonne L. v. New Mexico Department of Human Services,* 959 F.2d 883, 892 (10th Cir.1992), where the court quoted this very language from *Ledbetter.* In *Doe v. New York City Department of Social Services,* 649 F.2d 134, 137 (2d Cir.1981), the child "when she was two years old, was placed in foster care ... in the legal custody of the New York City

17

the placement is voluntary many courts—and all since *DeShaney* —have held that there is no such "special relationship." *See, e.g., Milburn v. Anne Arundel County Department of Social Services,* 871 F.2d 474, 476 (4th Cir.1989) (declining to find a "special relationship" because "[t]he State of Maryland by the affirmative exercise of its power had not restrained the plaintiff's liberty; he was voluntarily placed in the foster home by his natural parents"); *Fialkowski v. Greenwich Home For Children, Inc.,* 921 F.2d 459, 465-66 (3d Cir.1990);[5] *Monahan v. Dorchester Counseling*

---

Commissioner of Welfare," which subsequently placed her in foster homes where she was injured.

This was also the basis for the Seventh Circuit's decision in *K.H. ex rel Murphy v. Morgan,* 914 F.2d 846 (7th Cir.1990), where the court observed with respect to the female plaintiff that "The juvenile court ... ordered her removed from the custody of her parents ... [and] placed her with a foster parent." 914 F.2d 846 at 848. The court went on to say "Here ... the state removed a child from the custody of her parents; and having done so it could no more place her in a position of danger, deliberately and without justification ... than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be in danger...." *Id.* at 849. *Morgan* expressly recognizes that a different situation is presented, in which the state lacks responsibility, where there is a "*voluntary* placement by the natural parents." *Id.*

The special relationship that was referred to in dicta in our opinion in *Griffith v. Johnson,* 899 F.2d 1427, 1439 (5th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991), similarly was that which arose when the state involuntarily terminated the natural parent-child relationship by court proceedings and thereafter was appointed by the court as managing conservator for the child. *Id.* at 1431.

[5]Declining to find a "special relationship," the Third Circuit states:

"In this case, Walter Fialkowski's personal

18

*Center, Inc.,* 961 F.2d 987, 991 (1st Cir.1992).[6] *See also K.H. ex rel Murphy v. Morgan,* 914 F.2d 846, 849 (7th Cir.1990) (citing *Milburn* with approval).

   Post-*DeShaney,* there are no appellate decisions of which I am aware that have found a "special relationship" where the State is not holding the plaintiff "against his will." *Id.* 489 U.S. at 198, 109 S.Ct. at 1005. Even compulsory school attendance laws—*not present here*—have not sufficed for this purpose. *See Maldonado v. Josey,* 975 F.2d 727, 730-733 (10th Cir.1992), *cert. denied,* ---

---

> liberty was not substantially curtailed by the state in any way. His parents voluntarily placed him at the Greenwich Home CRRS; indeed, they specifically sought such a facility because they were not satisfied that he was making sufficient progress at the training facility in which he was previously placed. Not only were the Fialkowskis free to remove their son from the CRRS if they wished, but Walter Fialkowski himself enjoyed considerable freedom of movement. He was thus not deprived of freedom "through incarceration, institutionalization or other similar restraint of personal liberty.' *DeShaney,* 489 U.S. at 189, 109 S.Ct. at 998." *Id.* at 465-66 (footnote omitted).

[6]*Monahan* finds no special relationship, stating:

> "The complaint alleges that Monahan "voluntarily committed himself to the care and custody [of DMH and Millie's Cottage].' Because the state did not commit Monahan involuntarily, it did not take an "affirmative act' of restraining his liberty, an act which may trigger a corresponding due process duty to assume a special responsibility for his protection.... Monahan attempts to distinguish this case because, unlike Joshua DeShaney, who lived at home with his father, Monahan lived for six days in a facility administered by (or under contract to) the Commonwealth of Massachusetts.... Although Monahan may have had closer contacts with the state than did Joshua DeShaney, he was not being held "against his will,' nor had the state used its sovereign power to "render[ ] him unable to care for himself.' "

19

U.S. ----, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993); *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1371-72 (3d Cir.1992) (en banc), *cert. denied,* --- U.S. ----, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *J.O. v. Alton Community Unit Sch. Dist. II,* 909 F.2d 267, 272 (7th Cir.1990). Pre-*DeShaney,* there are a few appellate decisions—*none* by this Court—indicating that those "voluntarily committed" to a state mental hospital or facility for the retarded may stand in what amounts to a "special relationship" to the state institution. *See Goodman v. Parwatikar,* 570 F.2d 801, 804 (8th Cir.1978); *Society for Good Will To Retarded Children v. Cuomo,* 737 F.2d 1239, 1244 (2d Cir.1984). It is doubtful that these cases survive *DeShaney* as they are directly contrary to its held "against his will" rationale. Moreover, they seem to rely on the idea that by accepting custody of the individual the state assumed the duty to take affirmative action to protect him from fellow inmates.[7] This, however, runs counter to *DeShaney's* rejection of the analogous contention made there, *viz:*

> "It may well be that, by voluntarily undertaking to protect Joshua against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger. See

---

[7]Thus, *Goodman* states "[a]lthough there is nothing in the Constitution which requires the state of Missouri to admit all patients seeking treatment, once [plaintiff] Rachel was admitted as a patient, voluntary or involuntary, she had a constitutional right to a basically safe and humane living environment." *Id.* at 804. In *Society for Good Will,* the same thought was expressed: "Even granting that the State of New York was not required to build schools for the mentally retarded or admit voluntary residents, once it chose to house those voluntary residents, thus making them dependent on the state, it was required to do so in a manner that would not deprive them of constitutional rights." *Id.* at 1246.

Restatement (Second) of Torts § 323 (1965) ...; see generally W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts § 56 (5th ed. 1984) (discussing "special relationships' which may give rise to affirmative duties to act under the common law of tort). But the claim here is based on the Due Process Clause of the Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation.... A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not "all common-law duties owed by government actors were ... constitutionalized by the Fourteenth Amendment." *Id.* 489 U.S. at 201-02, 109 S.Ct. at 1006-07.

Moreover, even if *Goodman* or *Society for Good Will* survive *DeShaney,* they would not control the result here. There is no reason to believe that Walton's status at the School for the Deaf was comparable, in terms of his ability to act for himself and his general freedom, to that of a patient in a mental hospital or a retarded child in a state home. There is nothing to indicate that Walton was not competent mentally and, except for his deafness, physically. At the time of the first incident he was sixteen years old and at the time of the second—the one as to which recovery is sought—he was seventeen. The age of consent for sexual contact is generally not greater than sixteen. See 18 U.S.C. § 2243(a); Model Penal Code § 213.3(1)(a). See also *id.* § 213.4, comment 1. At common law, the age of consent to marry was fourteen for males. 52 AM.JUR.2D *Marriage* § 14; 55 C.J.S. *Marriage* § 111. At all times Walton was in the legal custody of his parents, and apparently resided with them during vacations and the like. They were free to withdraw him from the School for the Deaf at any time or, presumably, to change his status from that of boarder to day student. He was not subject to *any* compulsory school attendance.

21

Whatever restrictions he might have been under while he—on the basis of his parents' voluntary decision (and, for all we know, his own)—attended the school as a boarder are not shown to be significantly different from those which might be expected at a private boarding school. In contrast, in *Society for Good Will,* more than 75 percent of the residents were " "profoundly retarded (IQ below 20).' " In *Goodman* it was said that a constitutional violation might be found "*[i]f* plaintiff can establish ... a sufficient helplessness on the part of [the injured mental patient] Rachel," who had been involuntarily committed on at least two other occasions. *Id.* at 804 (emphasis added). In *Harper v. Cserr,* 544 F.2d 1121 (1st Cir.1976), the court said that its conclusion that "a voluntary inmate in a state institution, or her personal representative, may in some circumstances have a cause of action under § 1983 for malicious or wanton maltreatment or neglect, cannot be regarded as more than tentative in the present state of the law." *Id.* at 1122. It went on to observe that the "constitutional basis" for a duty to inmates of state institutions such as mental hospitals "has yet to be defined, especially with respect to inmates whom the state claims no right to confine. In the case of voluntarily committed persons, it would seem limited to those who by reason of disability are to a great degree helpless; and, if not confined *de jure,* are at least confined *de facto.*" *Id.* at 1123.[8] Here, it can hardly be said that Walton was "to a great

---

[8]*Cserr* was the principal authority relied on in *Goodman. Id.* at 804.

degree helpless."  There is nothing to indicate that he was incapable of living on his own or with his parents.

The majority's finding of a "special relationship" here is without support in reason or authority and is contrary to *DeShaney.*

Unfortunately, the worst is yet to come.  Appellant, whose position as superintendent of the School unquestionably involved the exercise of discretion, moved for summary judgment in part on the basis of qualified immunity.  It then became plaintiff's burden "to rebut this defense by establishing that the official's allegedly wrongful conduct [here, inaction] violated clearly established law."  *Salas v. Carpenter,* 980 F.2d 299, 306 (5th Cir.1992).  We do "not require that an official demonstrate that he did not violate clearly established federal rights;  our precedent places that burden upon plaintiffs."  *Id.*[9]  The federal right must have been clearly established in a sufficiently "particularized" sense so that it was then "clear that a reasonable official would understand that *what he is doing* violates that right."  *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523

---

We further observe that in *Spence v. Staras,* 507 F.2d 554 (7th Cir.1974), cited in *Cserr* (*id.* at 1123), the "nonverbal" inmate at the state hospital was described as a "person confined under state authority."  *Spence* at 557 (footnote omitted).

[9]And, it is settled that an official's violation of *state* law—no matter how well established and plain to one in his position—does not deprive him of section 1983 qualified immunity if under the circumstances it was not clearly established that his conduct violated the *federal* right sued on.  *Davis v. Scherer,* 468 U.S. 183, 193-95, 104 S.Ct. 3012, 3019-20, 82 L.Ed.2d 139 (1984).

(1987) (emphasis added).[10]

Not only does the majority unjustifiably decree a constitutional "special relationship" here, but it goes on to say that this was "clearly established law" in 1988. In other words, the majority holds that any reasonable superintendent of the Mississippi School for the Deaf must have realized in 1988 that an institution of that kind, at which attendance was voluntary, stood in the same relationship to its seventeen-year-old boarding students, who were past compulsory school age, were mentally and physically competent apart from their deafness, and remained in their parents' legal custody, as did a state prison or state mental hospital to its involuntary convicted or incompetent inmates. This must have been realized *despite* the total absence of any decision of the United States Supreme Court, or of this Court, or of any district court in this Circuit, tending to support such an analogy, with no case from this or any other circuit addressing the deaf (or blind or competent but physically ill, etc.), with numerous cases

---

[10]*See also, e.g., Barts v. Joyner,* 865 F.2d 1187, 1194 (11th Cir.1989) ("*Harlow's* "clearly established' standard demands that a bright line be crossed. The line is not to be found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances."); *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987) ("whether the law was clear *in relation to the specific facts confronting the public official* when he acted") (emphasis added); *K.H. Through Murphy v. Morgan,* 914 F.2d 846, 851 (7th Cir.1990) (although to defeat qualified immunity, a plaintiff need not "point to a previous case that differs only trivially from his case," nevertheless "[i]t is not enough, to justify denying immunity, that liability in a particular constellation of facts could have been, or even that it was, predicted from existing rules and decisions.... Liability in that particular set [of facts] must have been established at the time the defendant acted.").

holding voluntary custody insufficient, and with the few pre-*DeShaney* cases from other circuits suggesting such a relationship in the case of voluntary commitment dealing only with those so mentally ill or retarded as to be essentially helpless. The majority may not approve of the "clearly established law" requirement, or the way it was interpreted in *Anderson,* but surely they are bound by it, and may not drain it of all meaning and content. And that, surely, they have done here.

For these reasons, though I agree that there was no showing that appellant was deliberately indifferent to Walton's safety and that reversal is required, I am unable to join the majority opinion. I hence concur in the result.